UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
US INFORMATION GROUP LLC and VASILIY FOMIN,

Plaintiffs,

22-cv-6661 (PKC)

-against-

OPINION AND ORDER

EBF HOLDINGS, LLC (d/b/a EVEREST BUSINESS FUNDING d/b/a EBF), SCOTT CROCKETT, CAST CAPITAL LENDING CORP., BMV EQUITIES, LLC, PROSPERITAS CAPITAL, LLC, VADIM LEYBEL, BORIS LEYBEL, ERIC PEREMEN, and SAADIA SHAPIRO,

Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

In March and May of 2021, plaintiff US Information Group LLC ("US Info") entered into two agreements with defendant EBF Holdings, LLC, which does business as Everest Business Funding ("Everest"). Plaintiff Vasiliy Fomin, who is the owner and CEO of US Info and who signed the agreements on US Info's behalf, asserts that he erroneously believed that the two agreements were Merchant Cash Advance ("MCA") agreements pursuant to which Everest would be repaid based on a fixed percentage of US Info's future accounts receivable. Instead, plaintiffs assert, the agreements were conventional loans with interest rates that unlawfully exceeded the maximum rates permitted under New York's anti-usury laws.

Fomin and US Info assert that four entities and five individuals formed an enterprise under the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1961, et seq. ("RICO"), for the purpose of engaging in unlawful debt collection. They bring two substantive

RICO claims and one claim of RICO conspiracy.  The nine defendants collectively have filed three motions to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P.  (ECF 54, 59, 62.)

As will be discussed, MCAs are intended to provide financing to merchants in a way that differs from a traditional loan.  In an MCA, the "purchaser" (here, Everest) pays the "seller" (here, US Info) for the right to receive a percentage of the seller's future accounts receivable.  The seller receives upfront financing but its repayment obligations may be more onerous than those of a loan.  This is because the purchaser assumes the risk that the seller's future accounts receivable may decrease or stop altogether, with the purchaser suffering any resulting loss.

In recent years, several decisions have applied New York law to claims asserting that an MCA or similar merchant-funding agreement was actually a loan that imposed usurious interest rates.  Courts have looked to several factors to guide the analysis of whether an agreement is in the character of a loan and therefore subject to the anti-usury laws, or whether it is truly an MCA, in which case the usury laws do not apply.  The Complaint here makes no allegations addressing some of the most important factors considered by New York courts.  On other factors, the allegations are overbroad and conclusory, or are contradicted by the texts of the two agreements, which are annexed to the Complaint as exhibits.

Because the Complaint does not plausibly allege that US Info borrowed money from Everest in the form of a loan, as opposed to entering into an agreement for funding against future accounts receivable pursuant to an MCA, the Complaint fails to allege that defendants engaged in the collection of unlawful debt under RICO.  The Complaint will therefore be dismissed in its entirety.  Separately, the allegations as to six of the nine defendants fail to

plausibly allege their participation in a RICO enterprise. The Complaint is dismissed for this additional reason as to those six defendants.

BACKGROUND.

A. US Info's Agreements with Everest.

Fomin is the owner and CEO of US Info.[1] (Compl't ¶ 18.) In early 2021, Fomin was searching for funding sources online when an ad led him to non-party Jennifer Dominguez, who had the job title of Funding Manager at defendant Cast Capital Lending Corp. (Compl't ¶¶ 2-3, 40.) Fomin told Dominguez that he wanted to obtain funding for US Info through an MCA. (Compl't ¶ 4.)

As described in the Complaint, under an MCA, "a percentage of US Info's future receivables would be purchased by a funder for a lump sum." (Compl't ¶ 4.) The Complaint annexes a description of MCAs allegedly published on Everest's website. (Compl't Ex. 9.) It describes MCAs as alternatives to business loans that do not charge interest, and, instead, "us[e] a factor rate or holdback percentage. This rate or percentage is based on regular amounts of payments from the sales." (Id.)

After Fomin's communications with Dominguez, US Info entered into two agreements (the "Agreements") with Everest. (Compl't ¶¶ 5-6 & Exs. 1, 2.) Fomin asserts that he misunderstood the agreements to be MCAs when they actually were loan agreements that charged usurious interest rates. (Compl't ¶¶ 5-6 & Exs. 1, 2.) The Complaint asserts that Everest engages in the business of making unlawfully usurious loans that are "disguised" as MCAs. (Compl't ¶¶ 66-70.) It asserts that Everest determines the form of its agreements, and that it underwrites, services and collects on its usurious debt. (Compl't ¶ 68.)

[1] The nature of US Info's business and the source of its revenues are not described in the Complaint.

Though the Complaint often asserts that the Agreements provided for "disguised" or "hidden" loans, all purportedly unlawful terms identified in the Complaint are apparent on the face of the Agreements, which were executed and initialed on each page by Fomin. (Compl't Exs. 1-2.) Fomin's text messages with Dominguez, which are annexed to the Complaint, suggest that he was familiar with the distinction between a loan and MCA and was sophisticated about his financing options. (Compl't Ex. 6.) The Complaint does not allege that any defendant orally misrepresented the Agreements' contents. Though not germane to the issue of whether the Agreements provided for loans versus MCAs, the Complaint has not described how any terms were "disguised" or "hidden."

While the underlying amounts differ, the Agreements appear to be identical in all respects relevant to this motion. Both are headed "Payment Rights Purchase and Sale Agreement." (Compl't Exs. 1, 2.) Fomin's signature date on the first agreement is March 2, 2021 (the "First Agreement") and May 4, 2021 on the second agreement (the "Second Agreement"). (Id.) Both agreements provided that US Info, as seller, "hereby sells, assigns and transfers" to Everest "the Purchased Amount of Future Receipts by delivering to Purchaser the Specified Percentage of the proceeds of each future sale by Seller." (Id.) Each agreement includes a line stating, "Daily Payment = (Monthly Average Sales x Specified Percentage) / Average Weekdays in a Calendar Month," with a "specified percentage" of 15%. (Id.) Each agreement states: "Seller authorizes Purchaser to initiate electronic checks or ACH [i.e., American Clearinghouse System] debits from the Account equal to the Daily Payment each business day . . . ." (Id.) Each agreement also states, "There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Purchaser." (Id.)

The First Agreement lists a "purchase price" of $15,000, a "purchased amount" of $21,750, a "daily payment" of $271.88 and a "specified percentage" of 15%. (Compl't Ex. 1.)  It lists figures for US Info's monthly and annual sales. (Id.)  It specifies an "Amount Remitted to Seller" of $14,275 and itemizes $725 in fees taken by Everest. (Id.)

The Second Agreement listed a "purchase price" of $40,000, "purchased amount" of $58,000, "daily payment" of $414.29 and "specified percentage" of 15%. (Compl't Ex. 2.) The "Amount Remitted to Seller" is $28,423.96. (Id.)  In addition to $1,245 in fees, the agreement lists a "Payoff Existing Balance" amount of $10,331.04. (Id.)  It lists US Info's monthly and annual sales at amounts slightly higher than those recited in the First Agreement. (Id.)

Plaintiffs allege that the Agreements were traditional lending agreements, as opposed to the MCAs that Fomin mistakenly believed he was entering. (Compl't ¶¶ 42-75.)  The Complaint includes allegations of the use of fixed installments as opposed to a percentage of incoming accounts receivable, direct repayment from US Info instead of payment from US Info's customers, and the definition of events of default that purportedly placed all risks on US Info instead of transferring the risks of declining accounts receivable to Everest. (See id.)  Plaintiffs state that the repayment required under the First Agreement amounted to a rate of more than 235% per annum and more than 271% under the Second Agreement. (Compl't ¶ 55, 62.)

Plaintiffs assert that between March 2, 2021 and May 3, 2021, "Defendants" collected $12,234.60 from US Info, with daily repayment amounts of $271.88. (Compl't ¶¶ 55, 57.)  Plaintiffs state that they "were unable to sustain the burden" of this repayment schedule because it had no correlation to US Info's actual daily accounts receivables, "and were thus

forced to enter into *another* MCA in order to pay the First Contract." (Compl't ¶ 58; emphasis in original.)

Plaintiffs assert that under the Second Agreement, they paid Everest a daily amount of $414.29, which entailed a 140-day repayment period. (Compl't ¶ 62.) They state that the daily repayment was "disguised" as a good-faith estimate of 15% of US Info's daily revenue, but was actually an amount "dictated" by "Defendants." (Compl't ¶ 63.) The Complaint asserts that from May 4, 2021 to January 11, 2022, "Defendants" collected $48,471.93 from US Info. (Compl't ¶ 64.)

The Agreements are annexed to the Complaint and are therefore properly considered on this motion to dismiss. The Complaint makes no mention of several provisions that are important to distinguishing loans from MCAs, including the Agreements' reconciliation provisions, the details of what may constitute an event of default and their representation that the there was no fixed term for repayment. Plaintiffs do not assert that they ever invoked the reconciliation provision, which provided that payments "shall" be adjusted if there were a change to the seller's accounts receivable.

B.  The Complaints Allegations of a RICO Enterprise.

The Complaint asserts that Cast Capital, through non-party Dominguez, facilitated plaintiffs' funding-application process. (Compl't ¶ 72.) It asserts that through defendant Eric Peremen, Cast Capital later engaged in harassment and intimidation to "strong arm" plaintiffs into repayment. (Compl't ¶ 72.)

The Complaint asserts upon information and belief that EBF and Cast Capital entered into a series of agreements titled "Independent Sales Organization Agreement[s]," pursuant to which Cast Capital marketed and promoted Everest and collected on purportedly

usurious loans made to third-party borrowers (the "ISO Agreements").  (Compl't ¶ 73 & Ex. 11.)
According to plaintiffs, the ISO Agreements provided that Cast Capital would receive a
percentage of proceeds from the transactions.  (Compl't ¶ 74.)

Defendants named in the Complaint include Cast Capital, the CEO of Everest and
four directors of Cast Capital.  All allegations about job titles and responsibilities are made upon
information and belief.  Scott Crockett is alleged to be the CEO of Everest, with the authority to
control its statements, representations and decisions.  (Compl't ¶ 21.)  Vadim Leybel, Boris
Leybel, Eric Peremen and Saadia Shapiro are alleged to be directors of Cast Capital, with the
authority to control its statements, representations and decisions.  (Compl't ¶¶ 25, 27, 29, 31.)

The Complaint also names as defendants BMV Equities, LLC ("BMV") and
Prosperitas Capital, LLC ("Prosperitas").  (Compl't ¶¶ 33, 35.)  It alleges upon information and
belief that Vadim Leybel and Boris Leybel wholly own and/or control BMV, and that Peremen
and Shapiro wholly own and/or control Prosperitas.  (Compl't ¶¶ 34, 36.)  The Complaint, in
turn, alleges on information and belief that BMV or Prosperitas wholly own and/or control Cast
Capital.  (Compl't ¶¶ 23, 94(b).)  It makes no other allegations about BMV or Prosperitas.

The Complaint asserts that all defendants formed an association-in-fact enterprise
under RICO.  (Compl't ¶¶ 86-98.)  It asserts that they collect debt from "phony MCAs" and
impose interest rates that exceed twice the maximum enforceable rate under New York law, and
that defendants coordinate by sharing borrower information.  (Compl't ¶¶ 87-89.)  Plaintiffs
assert that this enterprise operates under the direction and control of the individual defendants,
who they collectively label the "Everest-Cast Managers" and "culpable persons" under RICO.
(Compl't ¶¶ 90-97.)

The Complaint alleges in the alternative that Everest is a RICO enterprise. (Compl't ¶¶ 99-108.) It asserts that Everest collects usurious debt on "phony MCAs" pursuant to the direction and control of defendant Crockett. (Compl't ¶¶ 99-104.)

US Info asserts that in June 2022, it halted further withdrawals by Everest on its debit account on the advice of counsel. (Compl't ¶ 115.) The Complaint alleges upon information and belief that on or about June 29, 2022, "employees and/or agents of Cast Capital and/or Everest appeared at Fomin's apartment residence, where they spoke to the concierge, falsely claiming to have an appointment with Fomin." (Compl't ¶ 116.) It also alleges that on or about June 29, 2022, defendant Peremen texted Fomin on his personal phone, stating, "Vasily, it's Eric Peremen. I need to discuss with u the loan that u took out with Everest Capital." (Compl't ¶ 117.) Peremen allegedly later texted him, "Vasia, If u think u will steal 250k n we will play by your rules u r mistaken."[2] (Compl't ¶ 119.) These exchanges between Fomin and Peremen are annexed to the Complaint. (ECF 36-5.) Peremen appeared to acknowledge that he was responsible for some type of visit to Fomin's residence, replying, "How would u handle this if roles were reversed?" (ECF 36-5 at 1.)

Count I of the Complaint asserts that all defendants formed an association-in-fact enterprise that had as its purpose the collection of unlawful debt in violation of RICO, 18 U.S.C. § 1962(c). (Compl't ¶¶ 120-136.) Count II asserts that all five individual defendants entered into a conspiracy to collect unlawful debt in violation of RICO, 18 U.S.C. § 1962(d). (Compl't ¶¶ 137-43.) Count III is alleged in the alternative, and asserts that Everest was an "enterprise" under the control of defendant Crockett, and that it engaged in the collection of unlawful debt in

[2] Apparently, these June 2022 communications did not relate to the two Agreements at issue here, but a later transaction between US Info and Everest in May 2022 in the amount of $250,000. (See 2nd Am. Compl't ¶¶ 71-76 (ECF 26).)

violation of RICO, 18 U.S.C. § 1962(c).  (Compl't ¶¶ 144-60.)  The Complaint alleges that plaintiffs suffered $18,000 in out-of-pocket losses and seeks treble damages, as well as a declaration stating that the Agreements created unlawful loans. (Compl't ¶¶ 111, 161-63.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

The Complaint annexes fifteen exhibits, including the two agreements between US Info and Everest.  (ECF 36.)  "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quotation marks omitted).  "[I]t is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents attached to the complaint as exhibits and documents incorporated by reference in the complaint."  Halebian v. Berv, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (internal quotation marks omitted).  "[W]here a conclusory allegation in the

complaint is contradicted by a document attached to the complaint, the document controls and

the allegation is not accepted as true."  Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140,

147 (2d Cir. 2011).

DISCUSSION.

I.      The Complaint Does Not Plausibly Allege that the Agreements Were for Loans that
        Created "Unlawful Debt" in Violation of New York's Usury Laws.

         All three RICO claims are premised on the assertion that through the Agreements,

Everest made usurious loans to US Info, and that defendants participated in an enterprise for the

purpose of collecting that unlawful debt.  Joined by all defendants, Everest and Crockett urge

that the Complaint should be dismissed in its entirety because it does not plausibly allege that the

transactions were in substance loans subject to New York's usury laws, as opposed to MCAs that

fall outside the usury law's reach.

         Because the Complaint does not plausibly allege that the Agreements had the

fixed payment requirements of a loan, or required US Info to bear the risk of loss in the event of

declining accounts receivable, it does not plausibly allege that Everest loaned money to US Info,

and the Complaint will be dismissed.

         RICO makes it unlawful for any person associated with an enterprise to conduct

or participate in the enterprise's pattern of "collection of unlawful debt."  18 U.S.C. § 1962(c).

RICO defines "unlawful debt" as debt "which is unenforceable under State or Federal law in

whole or in part as to principal or interest because of the laws relating to usury, and (B) which

was incurred in connection with . . . the business of lending money or a thing of value at a rate

usurious under State or Federal law, where the usurious rate is at least twice the enforceable

rate."  18 U.S.C. § 1961(6).  Thus, to allege a RICO violation stemming from the collection of

unlawful debt, a plaintiff must plausibly allege "proof that a debt existed, that it was

unenforceable under New York's usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt in some manner, and that the defendant acted knowingly, willfully and unlawfully." United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986).

There is no dispute that New York law governs the question of whether the Agreements provided for usurious loans. Paragraph 4.5 of the Agreements contains a New York choice-of-law provision. (Compl't Exs. 1, 2.) Under New York law, a person is guilty of criminal usury in the second degree where "he knowingly charges, takes or receives any money . . . as interest on the loan . . . at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y. Penal L. § 190.40.

In assessing whether the Complaint plausibly alleges that the Agreements were loans and not MCAs, the Court relies on basic principles of contract construction by reading the Agreements as a whole, enforcing them according their terms, and affording unambiguous terms their plain meanings. See, e.g., Beal Savings Bank v. Sommer, 8 N.Y.3d 318, 324 (2007). Plaintiffs do not allege that the Agreements are ambiguous or that are not completely integrated.

"Usury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 744 (1992) (quotation marks and internal citation omitted). "When determining whether a transaction is a loan, substance – not form – controls." Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 334 (2021). If a party is "not directly exposed to market risk in the value of the underlying assets," it is most likely a lender. Id. "Additionally, context, such as whether a party applied to the other for a loan or had outstanding, separate transactions, helps to distinguish between intent to borrow and intent to

engage in a joint transaction or exchange money for some other reason."  Id. (internal citations omitted).

"[W]hen determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it."  Zanfini v. Chandler, 197 A.D.3d 594, 595 (2d Dep't 2021) (quotation marks omitted).  "[T]he outcomes are strongly fact-bound and vary considerably."  Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022) (Rakoff, J.).  New York courts principally look to three non-exclusive factors that distinguish a loan from an MCA: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy."  LG Funding, LLC v. United Senior Properties of Olathe, LLC, 181 A.D.3d 664 (2d Dep't 2020).

The LG Funding factors "reduce to one overarching principle," which focuses on whether the financing party "is absolutely entitled to repayment under all circumstances" versus whether there has been a "transfer of risk."  Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022) (Liman, J.); see also Haymount, 609 F. Supp. 3d at 247 (the LG Funding factors should not be applied mechanically and are not themselves dispositive).  "The buyer bears a risk if the contingency – the seller's success (or lack thereof) collecting future receivables – determines the rate and completeness of repayment."  Womack v. Cap. Stack, LLC, 2019 WL 4142740, at *5 (S.D.N.Y. Aug. 30, 2019) (Carter, J.).

Citing LG Funding, the Second Department recently concluded that an agreement was not a loan when it contemplated monthly adjustments to payments, meaning that "the term of the agreement was not finite," and the agreement also contained no provision that a

declaration of bankruptcy would constitute an event of default. Principis Capital, LLC v. I Do, Inc., 201 A.D.3d 752, 754 (2d Dep't 2022). The First Department has weighed the discretionary character of any reconciliation provision, any allegations that defendants refused to permit reconciliation, whether daily payments represented a good-faith estimate of receivables, whether the rejection of an automated debit triggers an immediate event of default and any provisions authorizing defendants to collect against a personal guarantor. Davis v. Richmond Capital Grp., LLC, 194 A.D.3d 516, 517 (1st Dep't 2021).

Judge Karas granted a Rule 12(b)(6) motion directed to an affirmative usury claim challenging an Everest agreement that was substantially identical to the ones at issue here, concluding that "it is clear that the Funding Agreement is not a loan . . . ." Streamlined Consultants, Inc. v. EBF Holdings LLC, 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022).[3] He emphasized that the agreement provided for mandatory reconciliation if requested by the plaintiff, that plaintiff did not allege that it sought reconciliation or that the reconciliation provision was not honored by Everest, that the agreement expressly stated that it did not create a payment schedule, and that the agreement did not provide recourse to Everest if plaintiff declared bankruptcy. Id. at *4-5. "In so holding, the Court joins an ever-growing group of courts that have held that nearly identical agreements – and in one case, a fully identical agreement – is not a usurious loan." Id. at *5 (citing Cavalry LLC v. EBF Holdings, LLC, 2021 WL 5868324, *2-15 (N.Y. Sup. Ct. Orange Cnty. Oct. 5, 2021); Yellowstone Cap. LLC v. Cent. USA Wireless LLC, 110 N.Y.S.3d 485 (Table) (N.Y. Sup. Ct. Erie Cnty. June 25, 2018)); see

[3] The Streamlined plaintiff brought an affirmative usury claim seeking rescission. The court concluded that New York law does not recognize an affirmative claim of usury, then proceeded to explain that the claim was separately dismissed because the transaction was not plausibly alleged to be a loan as opposed to an MCA. Id. at *3-4. While defendants' motions in this case were sub judice, Judge Karas granted a motion to dismiss an amended pleading that reframed plaintiffs' allegations as a RICO claim, and again concluded that plaintiffs failed to plausibly allege that Everest's agreements provided for a loan. Streamlined Consultants, Inc. v. EBF Holdings LLC, 2023 WL 5835748, at *6 (S.D.N.Y. Sept. 8, 2023).

also Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC, 2023 WL 5161995 (4th Dep't Aug. 11, 2023) (citing Streamlined and LG Funding to support conclusion that "revenue purchase agreement" was not a loan).

In this case, the Complaint does not plausibly allege facts that, if accepted as true, would tend to show that the two Agreements were loans, as opposed to MCAs.

Perhaps most critically, the Complaint makes no allegation about the Agreements' reconciliation provisions, nor does plaintiffs' memoranda meaningfully respond to defendants' detailed arguments about their effects. See LG Funding, 181 A.D.3d at 666; Streamlined, 2022 WL 4368114, at *4 (Everest's mandatory reconciliation provision and plaintiff's failure to seek reconciliation weighed against allegation that transaction was loan). The Agreements include a boldface provision titled "Seller's Right to Reconciliation." (Compl't Exs. 1, 2.) It states in relevant part:

> The Daily Payment amount is intended to represent the Specified Percentage of Seller's Future Receipts. Seller may request that Purchaser reconcile Seller's actual receipts by either crediting or debiting the difference back to or from the Account so that the amount Purchaser debited in the most recent calendar month equaled the Specified Percentage of Future Receipts that Seller collected in that calendar month.

(Id.) It provides that Everest may request reasonable documentation, and that within four business days, Everest "shall reconcile Seller's actual receipts." (Id.; emphasis added).

Plaintiffs do not allege that the Agreements' reconciliation process was unduly onerous or had a sham quality. See, e.g., Haymount, 609 F. Supp. 3d at 248 (reconciliation provision weighed toward classifying agreement as a loan when the provision was "often impossible to use" and required notice within a five-day window following the final day of the month); New Y-Capp v. Arch Capital Funding, LLC, 2022 WL 4813962, at *5 (S.D.N.Y. Sept.

30, 2022) (complaint plausibly alleged obstacles to invoking reconciliation, including provision that reconciliation was at defendants' "sole discretion" and that merchant forfeited the right to future reconciliation if it failed to submit adequate documentation on its first application) (Carter, J.); Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 WL 1997207, at *13 (S.D.N.Y. June 6, 2022) (reconciliation provision was "largely illusory" when the adjustment of payments was left to the purchaser's "sole discretion") (Liman, J.), aff'd, 2023 WL 3882697 (2d Cir. June 8, 2023) ("nominal reconciliation provision" gave the transaction the character of a loan) (summary order).

By contrast, an enforceable reconciliation provision, pursuant to which payment is to be adjusted according to the seller's actual receipts, is generally inconsistent with classification as a loan subject to the usury laws.  See Principis, 201 A.D.3d at 754; Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 281 (S.D.N.Y. 2017) (allegation that defendant required payment in fixed amounts "is contradicted by the reconciliation provision . . . .") (Stanton, J.); Cavalry LLC, 2021 WL 5868324, at *5 ("The Agreement's provision for a monthly reconciliation to assure that the Daily Payments remitted to Everest do not exceed the Specified Percentage of Cavalry's actual receipts . . . supports a finding that the transaction was in actuality a sale of future receivables, not a loan.").  This is because the presence of a mandatory reconciliation provision reflects that the "purchaser" in the purported MCA has assumed the risks of repayment based on changes in the accounts receivable of a the "seller."  See, e.g., Lateral Recovery, 632 F. Supp. 3d at 460.  Reconciliation will adjust the seller's repayment obligations according to the reality of changes in receipts, as opposed to the fixed payments characteristic of a loan.

Further, in Streamlined, Judge Karas emphasized that plaintiffs "have not alleged that reconciliation did not in actuality function as agreed (or, indeed, that Plaintiffs ever even requested reconciliation)."  2022 WL 4368114, at *4; see also Spin Capital, LLC v. Golden Foothill Ins. Services, LLC, 2023 WL 2265717, at *3 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 28, 2023) (plaintiffs did not plausibly allege that reconciliation clause was a sham because they never requested reconciliation).  Here, plaintiffs' silence on reconciliation is curious because they allege that they entered the Second Agreement only because they were unable to keep pace with the payments required by the First Agreement.  (Compl't ¶ 58.)  The reconciliation provision may have permitted plaintiffs to adjust their payments to Everest, but plaintiffs do not allege that they invoked it or considered doing so.

The express language of the Agreements provides that Everest "shall reconcile [US Info's] actual receipts" within four business days of providing information verifying its receipts.  Unlike the agreements at issue in Fleetwood and New Y-Capp, the Agreements did not leave reconciliation to Everest's "sole discretion."  The Complaint's failure to allege that the reconciliation provision was not effective, and its corresponding failure to explain why the Agreements did not transfer the risk of loss to Everest, weigh against the plausibility of the allegation that the Agreements formed loans and not MCAs.

The existence of a valid reconciliation provision goes to another consideration under LG Funding, which looks to whether the agreement contains a finite term.  LG Funding, 181 A.D.3d at 666.  Under the heading "Purchaser Acknowledgement," the Agreements state: "There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Purchaser."  (Compl't Exs. 1, 2.)  The same provision states that Everest enters the agreement "knowing the risks that Seller's business may slow down or fail"

and expressly assumes those risks based on the seller's representations and warranties.[4] It is true that the Agreements each contained daily payment amounts that, if unmodified, would result in US Info making full repayment in a finite number of days. But again, the Complaint does not acknowledge the existence of the reconciliation provision, which, if invoked, would make the repayment period non-finite. See Principis, 201 A.D.3d at 754 ("as the amount of the monthly payments could change, the term of the agreement was not finite."); Cavalry LLC, 2021 WL 5868324, at *5 (Everest agreement was not fixed or finite because reconciliation provision made future payments contingent on receipts). The Complaint does not plausibly allege that the Agreements were fixed or finite.

The Complaint also makes no allegation concerning the third LG Funding factor, which looks to whether the purchaser has recourse in the event that the seller declares bankruptcy. 181 A.D.3d at 666. Bankruptcy is not among the events of default identified in paragraph 3.1 of the Agreements. The Agreements' "Purchaser Acknowledgement" provision states: "Seller going bankrupt or going out of business, in and of itself, does not constitute a breach of this Agreement." Paragraph 2.2 states that "Purchaser assumes the risk that . . . the full Purchased Amount may never be remitted because Seller's business went bankrupt . . . ." This LG Funding factor weighs against the plausibility of plaintiffs' assertion that the transactions were loans and not MCAs.

As noted, the three factors set forth in LG Funding are not exhaustive, and other factual allegations may lend plausibility to a transaction's characterization as a loan. Here, the

[4] Paragraph 2.2 of the Agreements similarly states: "Purchaser assumes the risk that Future Receipts will be remitted more slowly than Purchaser may have anticipated or projected because Seller's business has slowed down, or the full Purchased Amount may never be remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business."

Complaint's additional allegations are either vague or conclusory, or belied by the express language of the Agreements.

The Complaint alleges that the transactions are in the nature of a loan because US Info's payments were not based on a good-faith estimate of US Info's future accounts receivable and instead were set as fixed daily installments.  (Compl't ¶ 42.)  But under the heading "Seller's Information," the first page of each Agreement recited estimates for US Info's monthly sales: $65,525.48 in the First Agreement and $68,566.25 in the Second Agreement.  (Compl't Exs. 1, 2.)  Each agreement defined a "Daily Payment" as 15% of monthly sales, divided by number average weekdays per calendar month.  (Id.)  The Complaint does not explain why these figures were not good-faith estimates of US Info's future accounts receivable.  Without supporting allegations, the Complaint asserts that the daily payments were "dictated" by Everest based on "the length of the payment term." (Compl't ¶¶ 56, 63.)  The Complaint does not urge that Everest somehow inflated or concocted US Info's monthly sales figures, or, for instance, assert that US Info engages in a volatile or cyclical business with large monthly swings, thus rendering the estimates meaningless.  The Complaint does not plausibly allege why the Agreements did not reflect a good-faith estimate of US Info's future accounts receivable.  See Davis, 194 A.D.3d at 517.

The Complaint also alleges that under the Agreements, US Info "can be found in default" with payment due immediately if adequate funds are not maintained in the account designated for debits to Everest.  (Compl't ¶ 45.)  Declaring an event of default due to the rejection of an automatic debit is characteristic of a loan.  See Davis, 194 A.D.3d at 517.  But paragraph 3.1 of the Agreements defines "Event of Default" to include a failure by US Info to timely notify Everest "such that in any given calendar month there are five consecutive ACH

transactions attempted" by Everest that were rejected by US Info's bank, and US Info "fails to communicate and/or provide documentary evidence satisfactory to [Everest] for the failed transactions or failed remittance."  Contrary to the Complaint's characterization, this provision does not provide for an automatic event of default if US Info's debit account drops below a certain amount.  Rather, an event of default occurs if five consecutive withdrawal attempts are rejected and US Info fails to give notice and provide documentation about the failed transactions. The Complaint does not assert that the documentation requirements were onerous or a pretext for allowing Everest to declare an event of default.

The Complaint asserts that the Agreements give Everest "a *security interest* in US Info's 'accounts,' 'general intangibles,' and 'payment intangibles,' as each are defined in the UCC, to secure repayment of the corresponding purchased amount. . . ."  (Compl't ¶ 47; emphasis in original.)  But the full text of the relevant language limits these security interests to "Future Receipts" and not a broader category of assets:  "The Future Receipts sold by Seller to Purchaser pursuant to this Agreement are 'accounts', 'general intangibles', or 'payment intangibles'. . . ."  (Agreements ¶¶ 1.12.)  Thus, the Agreements gave Everest a secured interest in Future Receipts, not a broader category of assets.

The Complaint principally emphasizes that the Agreements do not require repayment to be made by US Info's customers and that Everest instead debits repayments from US Info directly.  (Compl't ¶¶ 43-46.)  According to plaintiffs, this is reflective of debt owed by US Info as an entity, as opposed to an agreement to be paid according US Info's future accounts receivable.  Citing precedent under the Perishable Agricultural Commodities Act, Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063 (2d Cir. 1995), some courts in this District have looked to whether the "purchaser" in a purported MCA collects payment from the

customers of the merchant, or whether instead payments come from a dedicated bank account maintained by the seller.  See Haymount, 609 F. Supp. 3d at 249; Fleetwood, 2022 WL 1997207, at *10.

But like other factors, this alone has not been treated as dispositive, and is one factor used to consider whether the MCA's purported "purchaser" functions like a lender or whether it has assumed the risks tied to future accounts receivable.  See Lateral Recovery, 632 F. Supp. 3d at 453 (noting that reliance on Endico Potatoes went solely to whether purchaser assumed risks or instead whether "debt" was "repayable absolutely").  Without addressing the issue directly, courts have repeatedly construed agreements providing for debit withdrawals of a merchant's sales revenues as funding agreements that are not loans subject to New York's usury laws.  See, e.g., Principis, 201 A.D.3d at 754; Streamlined, 2022 WL 4368114, at *4-5; Colonial Funding, 252 F. Supp. 3d at 283.  Requiring repayment from a dedicated bank account of the merchant does not itself suggest that the merchant has retained all risks of a decline in accounts receivable.  The Complaint includes no allegations about US Info's line of business or customer base.  Issues of administrability could make it impracticable for an entity like Everest to collect a percentage of payment from US Info's customers, instead of debiting from a dedicated bank account maintained by US Info.

The Complaint asserts that the Agreements' representations and warranties placed all risks of the transaction on US Info and Fomin as guarantor, and that Everest knew "from day one" that US Info would breach its representations and warranties.  (Compl't ¶¶ 50-51.)  The representations and warranties cited in the Complaint variously provide that US Info would conduct its business in good faith, conduct due diligence of customer finances, provide accurate financial information at Everest's request, represent that it is not presently in bankruptcy, that its

bank account is legitimate, warrant that it will place 15% of future sales proceeds in trust for the benefit of Everest, and engage in its ordinary course of business. (Agrmts. ¶¶ 2.1, 2.3, 2.11, 2.16-2.18.) The Complaint does not explain how these provisions placed all risks on US Info or Fomin. It also does not identify any breach of representations and warranties by US Info or any assertion by Everest that US Info had breached them.

Lastly, the Complaint points to a text message from non-party Dominguez to Fomin of May 31, 2021, in which she stated, "how's everything going with the *loan*." (Compl't ¶ 39; emphasis in original.) Peremen's text message of June 29, 2022 also referenced "the loan that u took out with Everest Capital . . . ." (Compl't ¶ 117.) As plaintiffs urge and acknowledge, whether a transaction is a loan is determined by substance, not form, Adar Bays, 37 N.Y.3d at 334, and the use of the word "loan" in this these messages does not transform the transaction into a loan.

Viewing the Complaint's allegations and the Agreements annexed thereto in the light most favorable to plaintiffs, the Complaint does not plausibly allege that the transactions at issue are loans subject to New York's usury laws. It therefore does not plausibly alleged that any defendant engaged in the collection of unlawful debt. Everest's motion will therefore be granted and the Complaint will be dismissed in its entirety.

## II. The Complaint Does Not Plausibly State a RICO Claim as to Six Defendants.

Even if the Complaint had plausibly alleged that Everest made usurious loans to US Info, the Complaint would be dismissed as to six of the nine defendants because the allegations against them are vague, conclusory and do not plausibly allege their participation in a RICO enterprise or conspiracy.

Count I is brought against all defendants and asserts an "Everest-Cast Enterprise" that operated as an association-in-fact under RICO. (Compl't ¶¶ 86-98, 120-136.) Count II is brought against all individual defendants and alleges that they conspired to form an enterprise that collected unlawful debt. (Compl't ¶¶ 137-43.) According to the Complaint, the enterprise locates and solicits merchants, offers funding, determines the form of contract, and funds and collects on unlawful debt. (Compl't ¶ 128.) The Complaint asserts that the enterprise operates under the direction and control of the individual defendants, who it describes as the "Everest-Cast Managers." (Compl't ¶¶ 93-98, 130.) According to the Complaint, to achieve its debt-collection goals, the enterprise members share between themselves a borrower's loan application and verification documents. (Compl't ¶ 88.) Nearly all allegations concerning the individual defendants are made on information and belief, including the assertion that they are responsible for day-to-day operations and guide the enterprise's overall goals and purpose. (Compl't ¶¶ 93-94.)[5]

RICO defines an enterprise as to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. . . ." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Boyle v. United States, 556 U.S. 938, 948 (2009). Such an enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

[5] The Court has not considered the factual assertions raised by defendant Shapiro, which challenge the truth of the Complaint and are not drawn from the Complaint's allegations, its exhibits or documents integral thereto. (ECF 56, 57-2.) To the extent that Shapiro's memorandum mentions in passing that plaintiffs ought to be sanctioned, any such application is denied.

The allegations concerning defendants Crockett, Shapiro, Vadim Leybel and Boris Leybel consist of little more than their titles as officers and/or directors and generalized descriptions of purported responsibilities.  The allegations are made on information and belief. BMV and Prosperitas are alleged on information and belief to be owned and/or controlled by various directors of Cast Capital.  None of the allegations made on information and belief contain supporting facts.  The Complaint is also replete with references to "defendants" and "Everest-Cast Managers" collectively.  (See, e.g., Compl't ¶¶ 11, 37, 54, 56-57, 61, 63-64, 91.) "By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the] complaint failed to satisfy this minimum [Rule 8] standard . . . ." Atuahene v. City of Hartford, 10 Fed. App'x 33, 34 (2d Cir. 2001) (summary order).

The Complaint does not plausibly allege that Crockett, Shapiro, Vadim Leybel, Boris Leybel, BMV and Prosperitas engaged in a substantive violation of RICO or conspired to do so.[6]  In addition to the Complaint's failure to plausibly allege that plaintiffs entered into a usurious loan, it is separately dismissed as to these six defendants.

CONCLUSION.

The Third Amended Complaint is dismissed because it fails to plausibly allege the collection of unlawful debt.  The Complaint is also dismissed as to defendants Crockett, Shapiro, Vadim Leybel, Boris Leybel, BMV and Prosperitas on the alternative ground that it does not plausibly allege participation in a RICO enterprise or conspiracy.

The Clerk is respectfully directed to terminate the motions (ECF 54, 59 and 62), enter judgment for defendants and close the case.

---

[6] Defendant Peremen is on a different footing in light of the text messages that he sent to Fomin.  (See Compl't Ex. 5.) The Complaint does not allege the collection of unlawful debt, and the Court does not reach the issue of whether the personal involvement of Peremen plausibly alleges that Peremen and Cast Capital had interests aligned with Everest that could amount to an enterprise with a common purpose.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 22, 2023